IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 2, 2008

## STATE OF TENNESSEE v. MULLANDRIC WEBB

**Direct Appeal from the Criminal Court for Shelby County**
**No. 03-06789     Lee V. Coffee, Judge**

**No. W2008-00094-CCA-R3-CD  - Filed April 16, 2009**

The defendant, Mullandric Webb, was convicted by a Shelby County jury of two counts of robbery, Class C felonies, two counts of aggravated robbery, Class B felonies, and one count of intentionally evading arrest, a Class D felony.  After merger of the robbery and aggravated robbery convictions, the defendant was sentenced as a Range I offender to twelve years to be served in the Tennessee Department of Correction concurrently with a four year sentence for intentionally evading arrest. On appeal, the defendant raises the following issues: (1) whether the trial court erred in denying the defendant's motion to suppress his statement; (2) whether the evidence was sufficient to sustain his convictions; and (3) whether the trial court imposed an excessive sentence.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Paul J. Springer, Memphis, Tennessee, for the appellant, Mullandric Webb.

Robert E. Cooper, Jr., Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lora Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

The facts giving rise to this appeal are as follows. The defendant was charged with four counts of aggravated robbery and one count of intentionally evading arrest. Richard Keith Goode, the victim, testified that on June 23, 2003, he was employed by Davel Communications as a payphone service technician. At approximately 9:30 a.m., he parked his service van in front of Monte's Market on Millbranch Road. He exited and locked the van, leaving a key in the ignition and carrying two additional van keys. After he removed the cash box from the payphone located in

front of the market, someone approached him from behind and put an arm around his neck. The victim moved to defend himself, but stopped when he felt a gun barrel in his ear. His assailant grabbed the cash box and the victim's keys and told him to lie on the ground. He threatened to blow the victim's head off if he did not identify which key opened the van. The victim testified that because he believed his assailant was going to kill him, he identified the van key, and his assailant took the van. The victim stated that he did not get a good look at his assailant's face. The victim immediately reported the incident to the police. The victim identified photographs depicting his van and showing the cash box taken by his assailant.

Officer Seitz of the Memphis Police Department testified that on June 23, 2003, he was driving an undercover police car in the South Precinct. He heard a radio report of a carjacking, and soon thereafter, he spotted a van matching the description given in the broadcast. Officer Seitz identified the defendant as the person driving the van. He described the defendant's driving as erratic and dangerous. Officer Seitz related that he followed the van onto Interstate 240 and exited the interstate highway behind the van at Norris Road. He then saw a marked squad car, operating blue lights and a siren, following in pursuit of the van. Officer Seitz estimated that both police cars were ten to twelve car lengths behind the van, and that all three vehicles were traveling fifty to sixty miles per hour. Officer Seitz stopped his unmarked police car at a red light, and the squad car also stopped, but the van ran the red light. Shortly thereafter, Officer Seitz lost sight of the van.

Officer Sam Blue with the Memphis Police Department testified that he was driving a squad car on patrol in the South Precinct. After hearing a broadcast describing a van involved in a carjacking, he spotted a white van headed south on Millbranch Road. Officer Blue made a U-turn, turned on his blue lights and siren, and pulled within five to six car lengths behind the van attempting to make a stop. The defendant evaded the stop by accelerating his speed, running through two red lights, and weaving through traffic.

Officer Milton Bonds testified he was assigned to the South Precinct Task Force Unit of the Memphis Police Department when he heard the radio report of the carjacking. Shortly thereafter, he saw the defendant running through a vacant lot and commanded him to stop. When the defendant did not stop, Officer Bonds left his patrol car and followed the defendant on foot. He eventually chased the defendant toward some officers and the defendant was taken into custody. When Officer Bond placed the defendant in his patrol car, the defendant blurred out: "I didn't rob that man, I just took his truck so I could get those coins out of it. It is over there at that dead-end off Niese Street."

On cross-examination, Officer Bond testified that he did not conduct a search of the area where the defendant was arrested. He performed a pat down of the defendant's person and did not find a weapon or a cellular telephone.

Lieutenant Brad Newsom of the Memphis Police Department testified that he and Sergeant Ayers questioned the defendant about the robbery. The interview took place at the police station after the defendant had been arrested. The defendant was advised of his *Miranda* rights and signed a waiver of rights form. The defendant then gave a statement in response to Lieutenant Newsom's questions. The statement reads as follows:

Lieutenant Newsom: Do you understand each of these rights I have explained to you?

The Defendant: Yes.

Lieutenant Newsom: Having these rights in mind do you wish to make a statement at this time?

The Defendant: Yes.

Lieutenant Newsom: Did you participate in the robbery of Richard Goode, which occurred at 4520 Millbranch, on June 23, 2003 at approximately 9:30 a.m.?

The Defendant: Yes.

Lieutenant Newsom: Did anyone else participate in this robbery with you, if so, name them?

The Defendant: No Sir.

Lieutenant Newsom: Were you armed with a weapon, if so, describe it?

The Defendant: No Sir.

Lieutenant Newsom: Did you indicate to the victim that you had a gun, or do something that caused the victim to believe that you were armed?

The Defendant: I poked him with my cell phone and he probably thought I had a gun

Lieutenant Newsom: What was taken in this robbery?

The Defendant: The money box that was sitting on top of the phone, there were two of them, one had money in it and the other was empty, and a white Chevrolet Astro Van.

Lieutenant Newsom: Did you use physical force on the victim, choking him and force him down onto the ground?

The Defendant: I just stuck my phone in his side and told him to lay down on the ground.

-3-

Lieutenant Newsom: Describe in detail, the events prior to, during and after this robbery?

The Defendant: I saw him at the phone at the store on Millbranch across from the Millcreek apartments. I went over there and poked him in the side with my cell phone and told him to lay down and told him to give me the keys, and the boxes on top of the phone. He gave me some keys and I took the boxes off the top of the phone booth and went to get in the van and I was trying to unlock it with one of the keys, and he had told me that it was a black key, so I unlocked the door and got in and the ignton (sic) key was already in the ignition, I started the van and left. The police got after me and I parked the van and got out on foot and ran. The police caught me and took me back, and then brought me here.

Lieutenant Newsom: Did you take any of the money from the van when you got out and ran?

The Defendant: No sir. It is all there, his money and his keys.

Lieutenant Newsom: Why did you participate in the robbery?

The Defendant: Cause of crack cocaine, I had just smoked some and this dude told me that he would give me a ¼ ounce of crack if I would just take the van and bring it to him.

Lieutenant Newsom: Who is this person that promised you the crack cocaine?

The Defendant: A man named "Goldie." He stays back there in Bunker Hill. I don't know the name of the street but I know the crack house where he stays.

Lieutenant Newsom: Is there anything else you would like to add to this statement?

The Defendant: I am sorry about what happened, I don't want to hurt anyone, I was just trying to get some crack cocaine cause I am addicted to the drug. I was not even thinking about the money, just was going to get the van and give it to "Goldie" so I could get some more crack. Please forgive me I will try to do better.

Lieutenant Newsom: Can you read and write without the aid of eyeglasses?

The Defendant: Yes.

Lieutenant Newsom:  Did you give this statement of your own free will, without threats, promises or coercion from anyone?

The Defendant:  Yes.

After reading the typed statement, the defendant initialed each page of the statement and signed the last page "Mullandric Webb 06/23/03 2:17 P.M." Lieutenant Newsom read the waiver of rights form and the defendant's statement to the jury. Copies of each document were provided to the jury and made trial exhibits.

On cross-examination, Lieutenant Newsom testified that the defendant was calm, coherent, and fully cognizant when he gave his statement and did not appear to be under the influence of crack cocaine. Lieutenant Newsom denied that he or Sergeant Ayers told the defendant that if he did not give a statement, he would spend the rest of his life in jail. Lieutenant Newsom acknowledged that the waiver of rights form was signed by the defendant at 1:45 p.m., and that the first page of the statement was marked before that time, at 1:30 p.m. However, he explained that 1:30 p.m. was the time that he began filling out the defendant's personal information including his educational level and telephone numbers. The defendant's actual statement was not taken until after the defendant had read aloud and signed the waiver of rights form.

Ms. Jessie Scruggs, the defendant's mother testified regarding the defendant's good character before he used drugs and his use of crack cocaine. Ms. Scruggs confirmed that she did not know anything about the facts of this case.

The defendant testified that he began smoking crack cocaine in 1992 and used the drug continually until 2003. The defendant stated that while he was using drugs, he had been convicted of aggravated burglary and theft of property. According to the defendant, he stopped smoking crack cocaine when he was arrested on this charge and his grandmother passed away.

The defendant testified that on June 23, 2003, he saw the victim leave the van unlocked and the key in the ignition. He claimed that he did not have a gun or a cellular telephone, and he denied grabbing the victim or taking the coin box. The defendant explained that he took the van because he was addicted to crack cocaine and a friend offered him a quarter ounce of the drug for the van. The defendant stated while he was driving the van, he saw a police car, but claimed that they did not signal him to stop. However, the defendant admitted that when he saw the police car he "speeded up" and stated that he did not stop when he knew that the police were following him.

According to the defendant's testimony, he was never advised of his rights. He stated that although he was not "high" when he gave his statement, he was under the influence of crack cocaine at the time of the interview and wanted more of the drug. He claimed that he initially told Lieutenant Newsom that he "just got in the van and drove off." The police told him that if he did not tell the truth "we're going to give you life." He then changed his story and told the police that he "put a phone to the victim's side and the victim probably thought the phone was a gun." Although the defendant admitted to having attended three years of college, he claimed that he did not read the

waiver of rights form or his typed statement. He asserted that he thought that by cooperating with the police, he would receive a lighter sentence. He also claimed that he was tired because he had been out smoking crack cocaine until 2:00 a.m. the preceding morning, drove his child to school at 7:00 a.m., and then obtained and smoked more crack cocaine before taking the van.

Based upon the evidence presented, the jury found the defendant guilty of robbery on counts one and two, aggravated robbery on counts three and four, and intentionally evading arrest reflected in count five. The trial court sentenced the defendant to six years incarceration for each conviction of robbery, twelve years incarceration for each conviction of aggravated robbery, and four years incarceration for the conviction of intentionally evading arrest. Counts one, two and four were merged with count three for a total of twelve years for aggravated robbery to be served concurrently with the four year sentence for intentionally evading arrest.

ANALYSIS

I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence to as to his convictions on charges of robbery, aggravated robbery, and intentionally evading arrest.

Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *Id*.

A. Robbery and Aggravated Robbery

The defendant does not deny that he took the van. However, he asserts that the evidence does not support his convictions for robbery because it does not show that he took the victim's personal property. The defendant contends that the evidence does not support his convictions of aggravated robbery because the verdicts on counts one and two showed that the jury did not believe that he was armed with a handgun. A person commits robbery by "the intentional or knowing theft of property

-6-

from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). "[I]f an offender, with the intent to deprive the owner, asserts control over property by means of the owner or possessor being removed from the presence of the property by force or fear, the offense of robbery is committed." *State v. Nix* 922 S.W.2d 894, 901 (Tenn. Crim. App.1995). Aggravated robbery is robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann § 39-13-402(a)(1). Viewed in the light most favorable to the state, the evidence presented at trial established that the defendant approached the victim from behind, grabbed him around the neck, used a cellular telephone in a manner that led the victim to reasonably believe it to be a handgun, and took from the victim a coin box and the victim's van and its contents. Therefore, we conclude that the evidence was sufficient to allow a rational jury to find that the defendant was guilty of both robbery and aggravated robbery.

## B.  Intentionally Evading Arrest

The defendant contends that the evidence does not show that the police gave a signal to alert him of their efforts to make a stop. He asserts that the jury's finding of guilt for intentionally evading arrest is not supported by the proof. Our code makes it "unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in this state, to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to bring the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1). When the flight or attempt to elude law enforcement creates a risk of death or injury to innocent bystanders or other third parties, the crime is elevated from a Class E to a Class D felony. Id. § 39-16-60.(b)(3). A defendant's testimony that he was aware that a police officer was attempting a stop may support his conviction for intentionally evading arrest. *State v. Adrian K. Nelson*, --- S.W.3d ----, (Tenn. Crim. App.2008), No. M2006-00653-CCA-R3-CD, 2008 WL 1839139, at *11 (Tenn. Crim. App., at Nashville, April 24, 2008).

The proof presented at the trial established that Officer Blue activated his blue lights and siren while making a U-turn on Millbranch Road, and then pursued the van with his emergency equipment on. During the pursuit, the defendant accelerated his speed, drove dangerously through traffic, and ran two red lights. The defendant admitted that he knew that the police were after him, and that he sped up to get away. The evidence was sufficient to support the defendant's conviction for intentionally evading arrest.

Accordingly, because we conclude that a rational jury could have found the essential elements of intentionally evading arrest, the defendant is not entitled to relief on this issue.

## II.  Defendant's Motion to Suppress

On appeal, the defendant contends that the trial court erred in admitting into evidence his statement which was obtained in violation of his constitutional rights. He asserts that prior to giving his statement, he was not advised of his rights, and further that he was under the influence of crack cocaine at the time of the police interview. The defendant also argues that the trial court inappropriately commented on the evidence by questioning Lieutenant Newsom at the suppression

hearing. According to the defendant, the court's questioning was an attempt to rehabilitate Lieutenant Newsom's testimony and prejudiced the judicial process. We first dispose of the defendant's assertion that the trial court's questioning of Lieutenant Newsom constituted improper comment on the evidence and threatened the judicial process. In deciding whether or not to suppress the evidence, it was the trial court's duty to determine whether the defendant's statement was knowingly and voluntarily given. The questioning of Lieutenant Newsom by the court was conducted at the pre-trial suppression hearing, and in satisfaction of the court's duty as the finder of fact. *See State v. Lawrence*, 154 S.W.3d 71, 75 (Tenn. 2005). In making this generic assertion, the defendant fails to explain how the court's questioning of Lieutenant Newsom prejudiced the pre-trial hearing. Moreover, authority cited in support of defendant's argument addresses conduct by a court in a jury trial and is not applicable to the court's conduct at the suppression hearing. We conclude that the court's questioning of Lieutenant Newsom was proper and appropriate in making factual determinations regarding the defendant's statement.

We turn now to the question of whether the trial court erred in denying the defendant's motion to suppress his statement. At the suppression hearing, Lieutenant Newsom testified that the defendant said that he could read and write and that he had attended some college. Lieutenant Newsom stated that the defendant was advised of his rights and acknowledged that he understood them. The defendant signed a waiver of rights form and told Lieutenant Newsom that he wanted to give a statement. Lieutenant Newsom denied that he or Sergeant Ayers threatened or coerced the defendant. The defendant read the typed statement aloud, initialed each assertion, signed the statement, and marked the time of his signature as "2:17 p.m." Upon questioning by the court, Lieutenant Newsom stated that the defendant's personal information, including that he had attended three years of college, was obtained directly from the defendant. Lieutenant Newsom confirmed that, in his experience as a police officer, he had seen a number of people under the influence of drugs or alcohol. Lieutenant Newsom testified that when he took the defendant's statement on June 23, 2003, the defendant did not appear to be under the influence of any drugs or alcohol. According to Lieutenant Newsom, had the defendant appeared to be under the influence of any intoxicant, the police would have placed him on hold for up to forty-eight hours for later questioning.

The defendant testified that he was never advised of his rights. He stated that the police threatened him with life in prison unless he admitted that he used a cell phone to poke the victim. He claimed that he signed the statement without reading it because he thought he would get a lighter sentence by cooperating with the police. The defendant stated that when Lieutenant Newsom questioned him, he was still under the influence of crack cocaine. The defendant stated that on the date of the police interview, he was aware of his rights, knew that he did not have to give a statement to the police, and also knew that he had a right to have an attorney present.

After hearing the foregoing testimony, the trial court accredited the testimony of Lieutenant Newsom. The trial court considered the contradictory testimony of the defendant and his past convictions including a felony involving dishonesty and deceit in making its decision. The court found that the defendant was advised of his *Miranda* rights, that the defendant knowingly and intelligently waived those rights, and that the defendant voluntarily gave a detailed statement. The

court also found that the defendant's statement was consistent and concise and that the defendant was not under the influence of an intoxicant when he gave his statement.

When reviewing the trial court's ruling on a motion to suppress, the court's findings of fact are presumed correct unless the evidence contained in the record preponderates against them. *See State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Lawrence*, 154 S.W.3d at 75 (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The prevailing party is entitled to the strongest legitimate view of the evidence along with all reasonable and legitimate inferences that may be drawn from that evidence. *State v. Hicks*, 55 S.W.3d 515, 521 (Tenn. 2001). However, appellate review of a trial court's conclusions of law and application of law to facts on a motion to suppress evidence is a de novo review. *See State v. Nicholson*, 188 S.W.3d 649, 656 (Tenn. 2006); *State v. Walton*, 41 S.W.3d 75, 81 (Tenn.2001).

Both the United States and Tennessee Constitutions protect the accused from compelled self-incrimination. *See* U.S. Const. amend. V; Tenn. Const. art. I, § 9. As a result, police officers are prohibited from using statements made by the accused during custodial interrogation unless the accused has been previously advised of his or her constitutional rights to remain silent and to an attorney, and the accused knowingly, voluntarily and intelligently waives those rights. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Whether waiver of a right is voluntarily, knowingly, and intelligently made is determined by the totality of the circumstances under which the right was waived. *See State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992).

"A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996) (citations and internal quotations omitted). A defendant's statement is not considered involuntary based only on the defendant's addiction to drugs. *State v. Michael V. Morris,* No. M2006-02738-CCA-R3-CD, 2008 WL 544567, at *7 (Tenn. Crim. App., at Nashville, Feb. 25, 2008) *perm. app. denied* (Tenn. Aug. 25, 2008). The law in this state is well-established that "[t]he ingestion of drugs and alcohol does not in and of itself render any subsequent confession involuntary." *State v. Morris*, 24 S.W.3d 788, 805 (Tenn. 2000). "It is only when an accused's faculties are so impaired that the confession cannot be considered the product of a free mind and rational intellect that it should be suppressed." *Id.* (citation omitted). The test is whether at the time of the statement, the accused was capable of making a narrative of the events or of stating his own participation in the crime. *Id.*(citations omitted).

"The primary consideration in determining the admissibility of the evidence is whether the confession is an act of free will." *State v. Berry*, 141 S.W. 3d 549, 577-78 (Tenn. 2004) A statement was not voluntarily given when "the behavior of the state's law enforcement officials was such as to overbear" the will of the accused and "bring about confessions not freely self-determined." *Id.* (citing *State v. Kelly*, 603 S.W.2d 726, 728 (Tenn.1980)(quoting *Rogers v. Richmond*, 365 U.S. 534,544 (1961)). In determining whether a defendant validly waived his rights, the court must consider the following factors: (1) the defendant's age, education or intelligence level, or previous experience with the judicial system; (2) the repeated and prolonged nature of the interrogation,

including the length of detention prior to the confession; (3) the lack of any advice regarding his constitutional rights; (4) the unnecessary delay in bringing the defendant before a magistrate prior to the confession; (5) the defendant's intoxication and ill health at the time the confession was made; (6) the deprivation of food, sleep or medical attention; (7) any physical abuse or threats made to the defendant. *See State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996); *State v. Readus*, 764 S.W.2d 770, 774 (Tenn. Crim. App. 1988).

In the instant case, the evidence showed that before giving his statement, the defendant was advised of his rights twice, and twice indicated he understood those rights. The evidence also showed that the defendant was not threatened or coerced, and that at the time that he gave a statement, the defendant did not appear to be under the influence of crack cocaine. Additionally, the defendant testified that he had attended three years of college and had experience with the judicial system. The defendant stated that at the time of the interview, he understood that he did not have to give a statement to the police and could have an attorney present. The court's findings that the defendant was read and understood his *Miranda* rights, voluntarily signed a waiver of those rights, was not threatened, and was not under the influence of any intoxicant at the time he gave a statement are supported by the record and are presumed correct. We conclude that the evidence does not preponderate against the trial court's denial of the defendant's motion to suppress. The defendant is not entitled to relief as to this issue.

### III. Sentencing

The defendant contends that his sentence is unconstitutionally excessive. He argues that the trial court erroneously enhanced his sentence based upon factors not supported by the evidence and which were elements of the charged offense.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. *See* Tenn. Code Ann. § 40-35-210(b); *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn.2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. *See State v. Samuels*, 44 S.W.3d 489, 492 (Tenn. 2001).

When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Pettus*, 986 S.W.2d 540, 543-44 (Tenn. 1999). However, if the record shows that the trial court failed to

consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely *de novo* without the presumption of correctness. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2003), Sentencing Comm'n Cmts. We will uphold the sentence imposed by the trial court if (1) the sentence complies with our sentencing statutes, and (2) the trial court's findings are adequately supported by the record. *See State v. Arnett*, 49 S.W.3d 250, 257 (Tenn. 2001); *see also* Tenn. Code Ann. § 40-35-210(f).

Effective June 7, 2005, our legislature, in response to the United States Supreme Court case of *Blakely v. Washington*, 542 U.S. 296 (2004), amended several provisions of the Criminal Sentencing Reform Act. *See* e.g., Tenn. Code Ann. § 40-35-210, Sentencing Comm'n Cmts. The amendments provided, among other things, that they be applied to defendants who committed a criminal offense on or after June 7, 2005. *See id.* The amendments further provided that a defendant who was sentenced after June 7, 2005, for offenses committed on or after July 1, 1982, may elect to be sentenced under the amended provisions of the Act by executing a waiver of ex post facto protections. *See id.* In the instant case, the defendant committed the offenses on June 23, 2003, and was sentenced on September 28, 2007. There is no waiver executed by the defendant in the record herein. Thus, the 2005 amendments to the 1989 Sentencing Act do not apply to the defendant.

Under the law as it existed before the 2005 amendments, unless enhancement factors were present, the presumptive sentence to be imposed was the minimum sentence within the range for Class B, C and D felonies. Tenn. Code. Ann § 40-35-210 (2003). Tennessee's pre-2005 sentencing act provided that the trial court was to increase the sentence within the range based on the existence of enhancement factors and then reduce the sentence as appropriate for any mitigating factors. *Id.* Also, the use of the pre-2005 sentencing scheme requires the trial court to evaluate the defendant's Sixth Amendment rights pursuant to *Blakely v. Washington*. In *Blakely*, the United States Supreme Court held that the Sixth Amendment right to a jury trial requires that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 542 U.S. at 301 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Thereafter, in *Cunningham v. California*, the United States Supreme Court extended the *Blakely* analysis to California's determinate sentencing scheme. In doing so, the Court noted:

> We cautioned in *Blakely*, however, that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from the force of our decisions. If the jury's verdict alone does not authorize the sentence, if, instead, the judge must find an additional fact to impose the longer term, the Sixth Amendment requirement is not satisfied.

*Cunningham*, 127 S.Ct. at 869. In response to *Cunningham*, the Tennessee Supreme Court issued an opinion on remand from the United States Supreme Court in *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007) (*Gomez II* ), which affects appellate review of a trial court's application of

enhancement factors to a defendant's sentence if the sentence falls outside of the 2005 amendments to the Sentencing Act. In *Gomez II*, the court confirmed *Blakely-Cunningham* precedents apply to our pre-2005 sentencing scheme and require that enhancement factors other than prior convictions be found by a jury or specifically admitted by the defendant. *Gomez II*, 239 S.W.3d 740.

Although, the transcript of the defendant's sentencing hearing is not contained in the record, it appears from the transcript of the motion for a new trial, that the court enhanced the defendant's sentence after considering the defendant's criminal history, and his previous history of unwillingness to comply with the conditions of a sentence involving release into the community. *See* Tenn. Code Ann. § 40-35-114(2),(9)(2003). The court also noted that it had considered mitigating factors: that the offenses were committed under unusual circumstances without a sustained intent to violate the law; and that defendant acted under some duress or domination of another person. *See id.* § 40-35-113(11),(12). However, the court gave little weight to the mitigating factors. The convictions of robbery and aggravated robbery were merged and the defendant was sentenced as a standard offender to twelve years incarceration to be served concurrently with a sentence of four years for intentionally evading arrest.

Following our review, we conclude the trial court did not err in sentencing the defendant. First, the presentence report supports the trial court's enhancement of defendant's sentence based on his past criminal convictions including aggravated burglary, aggravated criminal trespass, burglary, and theft. Second, and more importantly, the appellate record does not contain a transcript of the sentencing hearing. The transcript of the sentencing hearing is essential to our review of the findings of the trial court in sentencing the defendant. It is well-settled that the defendant, as the appealing party, has the burden of preparing a complete and accurate record relating to the issues on appeal. Tenn. R. App. P. 24(b). In the absence of a full and complete record revealing the issues that form the bases for the appeal, we must presume that the trial court was correct in its determination of confinement. *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993); *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991); *State v. Meeks*, 779 S.W.2d 394, 397 (Tenn. Crim. App. 1988).; *State v. Beech*, 744 S.W.2d 585, 588 (Tenn. Crim. App. 1987) (holding that Tenn. R. App. P. 24(b) applies to sentencing hearings). Accordingly, the defendant is not entitled to relief.

CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
J.C. McLIN, JUDGE